POWER SERVICE SUPPLY, INC. & another[1] *vs.* E. W. WIGGINS
AIRWAYS, INC.

Essex.   December 18, 1979. — February 5, 1980.

Present: BROWN, GREANEY, & PERRETTA, JJ.

*Practice, Civil,* Directed verdict. *Negligence,* Helicopter, Contributory.
   *Evidence,* Expert opinion, Opinion. *Witness,* Expert.

In a negligence action to recover for damages arising from the crash of
   the plaintiff's helicopter, the judge erred in directing a verdict for the
   defendant where there was sufficient evidence to warrant a finding
   that the helicopter accident was the result of the defendant's negli-
   gence in failing to inspect the helicopter properly.  [127-128]
In an action for breach of an oral contract for the inspection and repair
   of a helicopter, the judge erred in directing a verdict for the defendant
   where there was sufficient evidence to warrant findings that the con-
   tract required a thorough daily inspection of the entire aircraft and
   that the contract was breached by the defendant's failure to inspect for
   or discover a missing or improperly flared cotter pin.  [128-129]
In an action to recover damages arising from the crash of a helicopter,
   the plaintiff's expert was entitled to rely on a witness's testimony as to
   how the accident occurred where the witness's education, training and
   experience as a helicopter pilot, and his familiarity with his own air-
   craft, were sufficient to support his testimony as to certain particulars
   of the accident's occurrence.  [129-130]
In an action to recover damages arising from the crash of a helicopter,
   the judge did not abuse his discretion in qualifying as an expert a wit-
   ness whose qualifications included training in aeronautics, a master's
   degree in engineering, experience with aircraft in the Air Force and

[1] Edward A. Lavoie.

engineering school, a position in private industry dealing with aeronautics, and experience in both design, and stress analysis of nuts and bolts similar to that alleged to have caused the accident, even though he claimed no special knowledge of helicopter mechanics. [130]

In a negligence action tried before the effective date of the comparative negligence statute, the defendant was not entitled to a directed verdict where the evidence did not lead to the inescapable conclusion that the plaintiff was contributorily negligent. [131]

CONTRACT AND TORT. Writ in the Superior Court dated May 13, 1969.

The action was tried before *Cullen, J.*, a District Court judge sitting under statutory authority.

*Thomas M. Kiley* for the plaintiffs.

*Stephen C. Fulton* for the defendant.

GREANEY, J. On June 15, 1967, a Bell helicopter owned by Power Service Supply, Inc. (Power), was extensively damaged in an accident on Ponkapoag pond on the border of Canton and Milton. Power sought to recover for its property damage against E. W. Wiggins Airways, Inc. (Wiggins), on theories of negligent inspection and repair of the helicopter, res ipsa loquitur, and breach of a contract to service the aircraft. A passenger in the helicopter at the time of the crash, Edward A. Lavoie, sought damages for personal injuries on negligence theories. Certain of the claims were tried before a jury.[2] At the close of the plaintiffs' evidence the judge directed a verdict for the defendant on these claims which involved negligent inspection and repair and breach of contract. We hold that the evidence warranted submission of these claims to the jury and accordingly reverse.

---

[2] After the plaintiffs' openings the judge allowed the defendant's motion for a directed verdict as to the res ipsa loquitur claims. The appeal from the judgment entered pursuant to the allowance of that motion has been abandoned by the plaintiffs' failure to brief and argue it adequately. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). *Goldstein* v. *Columbia Diamond Ring Co.*, 366 Mass. 835, 843 (1975). Also, other claims against an employee of Wiggins were dismissed by agreement prior to the conclusion of the plaintiffs' cases. Mass.R.Civ.P. 41(a)(1)(ii), 365 Mass. 803 (1974).

We first summarize the relevant evidence most favorable to the plaintiffs. *Monterosso* v. *Gaudette,* 8 Mass. App. Ct. 93, 95 (1979). On June 15, 1967, Lawrence Keddy, Power's president and a licensed fixed wing and helicopter pilot, engaged Lavoie to drive him to Wiggins' place of business to pick up the company helicopter. Wiggins had been working on the aircraft for approximately one month pursuant to an oral agreement with Keddy, which required the installation of certain new equipment, inspection of the entire helicopter and replacement of parts as necessary. James Hornstra, helicopter maintenance supervisor for Wiggins, advised Keddy that the work on the helicopter was finished and that it was ready to go. Keddy testified that he performed the preflight inspection required of pilots by the Federal Aviation Administration (FAA), which he described as basically visual in character, with some manipulation of the flight controls to insure that they were functioning properly. Keddy then made four or five test flights.[3] After the test flights, he had Hornstra adjust the tail rotor controls to his satisfaction and make certain other adjustments. In the course of one of the adjustments, Keddy discovered a bolt missing from the area near the carburetor, which Hornstra replaced. Keddy and Lavoie then went for a flight which remained uneventful until Keddy attempted to land on Ponkapoag pond, where he had landed on several previous occasions. He brought the helicopter down to a hover on the lake by manipulating the controls which govern the pitch of the main rotor blades and the direction of the rotor head. As he pushed the throttle down, he felt a "giant force" on his right corner which started to tip the helicopter backwards. Keddy testified without objection that he then "went across the cyclic[4] which should have corrected [the

---

[3] Keddy testified that he also made frequent test flights of the helicopter while it was undergoing its maintenance and repair by Wiggins.

[4] The cyclic tips the rotor head in the direction in which the pilot wishes to fly. Another major control, the collective, determines the pitch of the main rotor blades on the helicopter. These control mechanisms operate by means of two push-pull rods.

tipping and] nothing happened." The helicopter flipped upside down, was submerged in the pond and extensively damaged.

Upon the aircraft's retrieval some ten days later, Hornstra pointed out to Keddy that a control rod, one of the two push-pull rods that serviced the helicopter's main rotor blades and controlled the pitch of the blades and attitude of the helicopter, was disconnected. A bolt which attached this rod to the "swash plate" lever arm was also discovered to be missing. Keddy testified, and his expert later agreed, that the helicopter could not have taken off had this bolt been missing before the flight. Keddy testified, over objection,[5] that in his opinion the bolt came out when he cut back on the throttle upon landing. He based that opinion on his observation that the controls felt normal and functioned properly until he had almost completed the landing, with the loss of complete control occurring thereafter. He was also permitted to testify over objection that, if the control mechanism to the rotor head becomes disconnected, the blades are free to tip to any pitch; that the wind will tilt disconnected rotor blades up, causing the centrifugal force from the blades to create considerable stress on the aircraft's right corner, in turn causing it to flip over; and that, in his opinion, the controls became disconnected from the rotor head prior to the helicopter's tipping upside down.

Keddy also expressed some familiarity with the different types of safety fastenings on the helicopter. At critical junctures, a castellated nut with slots through its end is placed on a bolt and held in place by a cotter pin, which is threaded through the slots and then flared at the end. It was stipulated that the missing bolt holding the disconnected push-pull rod would have been secured with a castellated nut and cotter pin in this fashion. On June 15, in the preflight inspection, Keddy observed that the bolt and nut

---

[5] The testimony objected to by the defendant and recited in this statement of the evidence was properly admitted for the reasons discussed later in this opinion.

were in place, but he did not specifically notice a cotter pin from the vantage point where he did his visual inspection. The helicopter had been approved for return to service following its periodic FAA required inspection two days before it was delivered to Wiggins, and no other mechanic or company had performed work on it between that time and the date of the accident.

Hornstra testified that, to his knowledge, an agreement existed with Wiggins to inspect the helicopter and replace parts as necessary; that, although the company kept time slips for the work performed, he could find none for time spent inspecting this helicopter; that on May 25, 1967, two bolts located in the swash plate approximately three inches from the critical bolt found missing after the accident were determined to be rusty and were replaced under the agreement; that another mechanic replaced the bolts, but that he checked to see if their cotter pins were in place; that he replaced a missing bolt pursuant to the agreement on June 15, 1967; that an agreement of this nature includes daily inspections of the entire helicopter; and that Wiggins' installation of a power boost cylinder in the aircraft (similar to power steering in an automobile) required that the entire control system be checked.

The plaintiff's expert, James Cragin, an engineer with a degree in aeronautics and the holder of FAA pilot's and mechanic's certificates, advanced the theory that the crash was caused by the bolt backing out when Keddy pulled back on the throttle, due to the absence of a properly flared cotter pin to hold the castellated nut in place. He testified that the bolt and nut are assembled only "fingertight" and that the cotter pin is needed because the fitting is subject to vibrations which can cause the nut to unscrew. He based his opinion principally on his examination of certain exhibits involving the detached push-pull rod which revealed helicle grooves caused by pieces of steel rubbing against each other — "in this case . . . a threaded portion of the bolt," and the manual provided with the helicopter by Bell, which listed the specifications for the missing bolt. If the fitting was cor-

rectly aligned, the threads of the bolt in question would not be "in bearing" and no helicle grooves would have appeared. He also testified that a properly installed and flared cotter pin would have been subjected to minimal stress; that correctly installed, the nut and bolt could not have detached; that the helicopter could not have flown if the bolt was missing on take-off; and that the presence or absence of a cotter pin would be the proper subject of an inspection by a mechanic under a duty to inspect the helicopter and repair and replace parts as necessary.

1. A motion for directed verdict is properly granted only where the evidence construed most favorably to the plaintiff is insufficient to support a verdict in his favor. *DiMarzo* v. *S. & P. Realty Corp.*, 364 Mass. 510, 514 (1974). *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976). More specifically, the test has been stated as whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). That the inferences be reasonable requires that they be based on "probabilities rather than possibilities" and not result from "mere speculation and conjecture." *Alholm* v. *Wareham, supra* at 627.

With regard to the negligence claims, the jury could warrantably have concluded from the evidence properly before it that a crucial bolt connecting one of the push-pull rods to the helicopter's main rotor blades, without which the aircraft could not have taken off, was in the process of working its way out during the last flight on June 15, 1967, and that the bolt detached at the moment that Keddy backed off the throttle. The evidence also made it more probable than not that the nut holding the bolt had unscrewed sometime after Keddy's inspection, because the nut was not securely fastened by a properly installed cotter pin. Compare *Maher* v. *General Motors Corp.*, 370 Mass. 231, 234 (1976); *Kennedy* v. *U Haul Co.*, 360 Mass. 71, 74 (1971) (as to U-Haul). There was sufficient evidence to permit the jury to draw one of two permissible inferences with regard to the cotter pin:

(a) either that it was missing entirely at the commencement of the flight, or (b) that its ends were not appropriately flared so that it worked its way out during the flight. "There is no requirement of law that the plaintiff point out the exact way an accident happens. The plaintiff sustained [its] burden if [it] proved that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than any other cause." *McLaughlin* v. *Bernstein*, 356 Mass. 219, 226 (1969). *Carey* v. *General Motors Corp.*, 377 Mass. 736, 740 (1979). Restatement (Second) of Torts § 433B, Comment b (1965). With the additional evidence that the defendant had contracted to inspect and repair the helicopter, that its contract required daily inspection of the entire aircraft, and that a bolt had been found missing in the muffler section of the carburetor on the very day of the accident, the jury properly could have concluded that the defendant negligently failed to inspect the crucial fitting altogether (*Kennedy* v. *U Haul Co.*, *supra* at 74; *Ford* v. *Flaherty*, 1 Mass. App. Ct. 16, 18-20 [1972]), or that it conducted its inspection haphazardly in circumstances where a closer inspection would have revealed and led to the correction of a dangerous condition not visible to Keddy. *Black* v. *Boston Consol. Gas. Co.*, 325 Mass. 505, 509 (1950). *Poirier* v. *Plymouth*, 374 Mass. 206, 216 (1978). The duties imposed on Wiggins would also run to the benefit of Lavoie as a foreseeable plaintiff. *Banaghan* v. *Dewey*, 340 Mass. 73, 80 (1959). Restatement (Second) of Torts § 324A (1965). The chain of inferences concerning the accident's cause was not so slight as to amount to speculation or conjecture requiring that consideration of the question of Wiggins' negligence be withheld from the jury.

2. With regard to Power's contract claim, it was for the jury to ascertain the terms and conditions of the oral contract (*Goldstein* v. *Katz*, 325 Mass. 428, 430 [1950], and cases cited), and whether it had been fully performed. *Green* v. *Richmond*, 369 Mass. 47, 53 (1975). The evidence was sufficient to permit the jury to find that the contract to

inspect and repair the helicopter and to replace parts as necessary required a thorough daily inspection of the entire aircraft until such time as it was returned to Power (*Bulpett v. Dodge Assoc., Inc.*, 5 Mass. App. Ct. 593, 598 [1977]), and that the contract was breached by the defendant's failure to inspect for or discover a missing or improperly flared cotter pin.[6] It was also open to the jury to conclude that the accident would not have occurred had an adequate inspection taken place and that Power's damages were a probable result of the contract's breach. *Bulpett v. Dodge Assoc. Inc.*, *supra* at 598-600; 5 Corbin, Contracts § 1007 (1964); 11 Williston, Contracts § 1344 (3rd ed. 1968).

3. We address the remaining arguments made in support of the allowance of the directed verdict.

(a) The defendant maintains that Cragin's reliance on a portion of Keddy's testimony as to how the accident occurred was misplaced reliance on testimony in the nature of an opinion which Keddy was unqualified to give and which, if removed from the case,[7] would have left the cause of the accident in the realm of conjecture. We cannot say that the judge's careful handling of Keddy's testimony allowed impermissible opinions to slip into the case, to be built upon later by Cragin's testimony. Keddy's education, training and experience as a helicopter pilot, and his familiarity with the workings of his own aircraft were sufficient to support his testimony as to certain particulars of the accident's occur-

---

[6] The defendant argues that there were in fact two contracts to service the helicopter. The first, it is claimed, involved inspection and repair and was completed on or about June 1, 1967. The second involved repairs to the tail rotor section following some damage to it in June, 1967. The defendant maintains that it was not obligated to conduct inspections or repair any parts except the tail rotor under the contract prevailing at the time of the accident. The scope of the contract and its provisions was, as indicated, for the jury to determine. Evidence that the defendant had conducted an inspection and replaced a missing bolt on the date of the accident was sufficient to permit the jury to conclude that the defendant was still under a contractual duty to inspect and repair on June 15, 1967.

[7] The portion of Keddy's testimony complained about concerns his opinion that the bolt came out of its fitting when he backed off the throttle.

rence. *Venini* v. *Dias,* 5 Mass. App. Ct. 695, 697-699 (1977).
See also *DeJesus* v. *Hamel,* 349 Mass. 764 (1965); *Samii* v.
*Baystate Medical Center, Inc.,* 8 Mass. App. Ct. 911 (1979).
A witness can be found qualified to express an opinion con-
cerning some matters but not concerning other related mat-
ters. Leach & Liacos, Massachusetts Evidence 97-98 (4th ed.
1967). Moreover, the precise statement objected to could
have been inferred from other evidence properly in the case,
including evidence that the aircraft could not have taken off
without the fitting in place, that the collective and cyclic
controls operated normally during a routine hover landing
until the throttle was disengaged, and that the cyclic and
other controls thereafter failed to correct the backward
pitch, indicating that the control mechanisms attached to the
rotor head had become disconnected.

(b) Cragin's qualifications were developed during a
thorough voir dire. They included training in aeronautics,
a master's degree in engineering, experience with aircraft in
the Air Force and engineering school, a position in private
industry dealing with aeronautics for the space industry,
and experience in both design and stress analysis of nuts and
bolts similar to the one in question. Even though he
claimed no special knowledge of helicopter mechanics, the
judge did not abuse his discretion in qualifying him as an ex-
pert (*Campbell* v. *Thornton,* 368 Mass. 528, 541 [1975]) or
in permitting him to render an opinion on the cause of the
accident based on the facts he observed, as well as on those
within his own area of knowledge and those which he
assumed, based on the testimony of other witnesses. *Com-
monwealth* v. *Russ,* 232 Mass. 58, 73 (1919). See also *Black*
v. *Boston Consol. Gas Co.,* 325 Mass. 505, 507-508 (1950).
Contrast *Kennedy* v. *U-Haul Co.,* 360 Mass. 71, 73-74
(1971). Cragin's conclusions were more than mere guess-
work or conjecture. Any infirmities in his testimony
brought to light by cross-examination went to the weight of
the testimony as opposed to its admissibility. *Common-
wealth* v. *Shea,* 356 Mass. 358, 361 (1969). *Wax's Case,* 357
Mass. 599, 602 (1970).

(c) Because the comparative negligence statute was not in effect at the time of this accident, any recovery by Power would be barred if Keddy were contributorily negligent. G. L. c. 231, § 85, as in effect prior to St. 1969, c. 761. The defendant argues that if, as the plaintiffs contend, the accident was caused by its negligent inspection and consequent failure to discover an improperly installed or missing cotter pin, then Keddy was contributorily negligent as a matter of law in failing to discover the same problem during his FAA required preflight inspection. While applicable FAA regulations prohibit operation of an aircraft not in an airworthy condition and hold the pilot primarily responsible for determining if an aircraft is safe to fly, Keddy testified that he conducted his preflight inspection in the usual course. It was not established that the scope of his inspection was inadequate as a matter of law, and his uncontradicted testimony was that, from the vantage point where he normally performs his visual inspection, he could see nuts and bolts but could not see cotter pins. His mechanical inspection performed by means of manipulating the controls would not necessarily disclose any problem with a bolt which was working its way out. Thus, jury questions were presented as to whether Keddy conducted a reasonable preflight inspection[8] and whether a stricter level of inspection was required of Wiggins by the contract than was required of Keddy by the FAA regulations. This is not a case where the evidence led to the inescapable conclusion that Keddy was contributorily negligent. See *Salvato* v. *DiSilva Transp. Co.*, 329 Mass. 305, 310-312 (1952). Compare and contrast *Brown* v. *Boston & Maine Ry.*, 302 Mass. 90-91-92 (1939).

4. This action was entered on July 7, 1969, and was reached for trial in May, 1978. The reversal of the allow-

---

[8] The principal authority brought to our attention by the defendant on the issue of contributory negligence of a pilot under FAA regulations requiring preflight inspections holds that a reasonable preflight inspection is necessary and that the pilot is charged with his failure to notice open and obvious defects such as a missing rudder. *Lock* v. *Packard Flying Serv., Inc.*, 185 Neb. 71, 73 (1970).

ance of the motion for directed verdict necessitates a retrial some twelve years after the accident. No better example can be found for utilization of the judgment notwithstanding the verdict procedure provided for in Mass.R.Civ.P. 50(b), 365 Mass. 814-815 (1974), which permits a judge upon appropriate motion to resolve doubts about the sufficiency of the proof after the jury has given the case a hard look. This procedure is flexible, best conserves precious trial court time and creates a record which allows the appellate court, in most instances, to terminate the litigation once and for all. *Soares* v. *Lakeville Baseball Camp, Inc.,* 369 Mass. 974, 975 (1976).

For these reasons the direction of the verdict as to counts 1, 3 and 6 was improper. The judgment for the defendant entered on those counts is reversed.

*So ordered.*