van Gestel,
J. This matter is before the Court on the motion by the plaintiffs and defendants-in-counterclaim (here collectively called “New Boston”)[1] seeking a judgment notwithstanding the verdict of the jury pursuant to Mass.R.Civ.P. Rule 50(b) or, in the alternative, a new trial pursuant to Mass.R.Civ.P. Rule 59, or a remittitur. The defendant and plaintiff-in-counterclaim, Karen DeMichele (“DeMichele”), opposes all requests.
This jury trial began on September 18, 2002, and lasted for ten trial days to October 1, 2002. The jury deliberated from approximately 1:00 p.m. on October 1, 2002, until almost noon on October 2, 2002.
The case was made unduly complicated by the number of parties and the myriad of claims and counterclaims involved. Further, this motion comes before the Court at a time when there is no transcript *474 of any part of the trial or the instructions to the jury. Thus, this Court is, as most trial Courts are on these kinds of motions, immensely handicapped in its ability to assess the case in its entirety and harmonize the actions of the jury, relying only on its notes and its memory of complicated legal proceedings.
The case was presented to the jury on a series of 42 special questions crafted by the Court after reviewing a draft submitted by New Boston, and hearing the comments thereon by counsel for all parties.

The Appropriate Legal Standards

A Rule 50(b) motion raises essentially the same issues ás those that are presented to the Court on a motion for a directed verdict. Birbiglia v. Saint Vincent Hospital, Inc., 427 Mass. 80, 83 (1998). The question is whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the prevailing party. Cormier v. Pezrow New England, Inc., 437 Mass. 302, 308 (2002); Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 121 (1992); Thurston v. Ballow, 23 Mass.App.Ct. 737, 741 n. (1987).
An inference is reasonable if it is based on probability, as opposed to possibility or mere speculation and conjecture. Power Supply, Inc. v. E.W. Wiggins Airways, Inc., 9 Mass.App.Ct. 122, 127 (1980). See also Commonwealth v. Seven Thousand Two Hundred Forty-Six Dollars, 404 Mass. 763, 765 (1989).
The Court must accept the evidence in the light most favorable to the prevailing party. McAvoy Travel Bureau, Inc., v. Norton Co., 408 Mass. 704, 707 (1990). If the jujy has been left to find the moving party liable on either of two theories, and the other side’s evidence is insufficient as to one of them, the moving party is entitled to a new trial if the Court cannot determine whether the verdict rested on the correct theory. Kelley v. Stop & Shop Cos., 26 Mass.App.Ct. 557, 559 (1988). Only when no rational view of the evidence warrants a finding that the moving party is liable may the Court take the matter from the jury. Foster v. Loft Inc., 26 Mass.App.Ct. 289, 292 (1988).
This case went to the jury on special questions, pursuant to Mass.R.Civ.P. Rule 49. “No party can, by motion or otherwise, compel” the use of the special verdict or answers to interrogatories by a jury. “[S]uggestion is the limit of counsel’s power.” Smith & Zobel, Rules Practice, 8 Mass. Practice Series, Sec. 49.3. The nature, scope and form of special questions to a jury are entirely within the Court’s discretion. Draghetti v. Chmielewski, 416 Mass. 808, 818 (1994).
“Where there is a view of the case that makes the jury’s answers to special interrogatories consistent, they must be resolved that way.” Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines Ltd., 369 U.S. 355, 364 (1962). Thus, if the jury’s answers can be harmonized, they must be resolved so as to harmonize them. Solimene v. B. Graul & Co., K.G., 399 Mass. 790 (1987).
A judge may set aside a jury’s answers to special questions and enter judgment for the opposing party if, as a matter of law, the answers cannot stand. The process is much like that which occurs when a verdict is directed. See, e.g., Thompson v. Auto Credit Rehabilitation Corporation, 56 Mass.App.Ct. 1, 6-7 (2002).
Before addressing each of the many issues raised in the plaintiffs’ motion, the Court will describe briefly the parties and the several claims that they have presented.
The Parties and Their Claims
On January 18, 2001, the plaintiffs New Boston Select Group, Inc. and NBSS, Inc. d/b/a New Boston Select Staffing, filed this suit against DeMichele, claiming that she breached her fiduciary duty to the company and negligently misrepresented facts in connection with both the entry into a lease for space at Southborough, Massachusetts (the “Southborough lease”), for her division of New Boston and the purchase of a Caldwell-Spartin computer system (the “computer system”) for her division of New Boston.
DeMichele responded with a ten-count counterclaim charging: disparate treatment under Title VII; disparate treatment under G.L.c. 15IB; sexual harassment under Title VII; sexual harassment under G.L.c. 151B; retaliation under Title VII; retaliation under G.L.c. 15 IB; intimidation, threats, coercion, interference and aiding and abetting under G.L.c. 151B; breach of contract; breach of the covenant of good faith and fair dealing; and interference with contractual relations. DeMichele’s counterclaims were directed not just at the plaintiffs New Boston Select Group, Inc. and NBSS Inc. d/b/a New Boston Select Staffing (“Select Staffing”), but also at Select Appointments North America, Inc. (“SANA”), Nicholas J. Lento (“Lento”) and Joseph Strong (“Strong”).[2]

General Background

The evidence, including reasonable inferences, amply supported the following general background of the parties’ interactions.
DeMichele became employed by New Boston Select Group, Inc. (then known as Select Aquisitions Corporation) in August 1994, when the business of DeMichele’s employer, Select Staffing (f/k/a New Boston Temps, Inc.), was purchased by New Boston. New Boston provides staffing placement services in North America through numerous subsidiaries and divisions, including Select Staffing.
By 2000, DeMichele had moved up in the ranks to the position of President of Select Staffing. She, along with other division heads of New Boston, reported directly to SANA, the President and Chief Executive Officer of which originally was the defendant Strong. In 2000, Strong assumed the position of Vice Chairman of SANA, and the defendant Lento became SANA’S *475 President and CEO. SANA serves as the administrative head of a group of staffing companies including New Boston Select Group, Inc. and NBSS, Inc. Lento, as president of SANA, was DeMichele’s immediate supervisor; and Strong, as vice-chair of SANA, was Lento’s immediate supervisor.
In 2000, DeMichele and her senior management team at Select Staffing started two business initiatives: (1) relocating Select Staffing’s headquarters from Boston to Southborough, Massachusetts; and (2) obtaining a new computer system for Select Staffing.
Lento accepted DeMichele’s recommendations for the new lease in Southborough. In fact, after review by the company’s attorneys and approval by its Management Board, Lento signed the lease himself.
Similarly, with the new computer system there was executive approval above DeMichele by Lento and the SANA Controller, and the Management Board as well. The purchase order for the computer system was signed by SANA’S Chief Financial Officer.
Both the Southborough lease and the computer system purchase order were executed in early November 2000.
Shortly thereafter, on the afternoon of November 14, 2000, in an event that was factually intensive and vigorously disputed, DeMichele had a conversation with Lento and Strong. In the conversation, Lento and Strong say that DeMichele announced that she had a job offer from a competitor and was going to resign. The next day, Lento advised DeMichele that her “resignation” was accepted. DeMichele testified — and the juiy could, therefore, believe — that she did not say that she had accepted an offer from a competitor, nor did she say she was resigning, and asserted that she strenuously tried to dissuade Lento from terminating her employment, an attempt that failed.
The jury was asked in special question No. 1: “Did Ms. DeMichele resign from her position as President at New Boston?” They answered: “No.”
The' factual essence of DeMichele’s sexual harassment counterclaims relate to certain boorish comments made by a man named Anthony Martin (“Martin"), Chairman of Vedior, N.V. (“Vedior”). Vedior, based in Amsterdam, is the parent company of Vedior Holdings BV, which in turn is the parent company of Vedior Holdings, U.S., Inc., a Delaware corporation, which is the parent company of SANA. Martin, among his other positions in the corporate empire, is also chairman of SANA.
A resident of England, Martin is described — in contested factual assertions, but which the jury could believe — as having met DeMichele on seven occasions between 1994 and October 10, 2000. On three of those occasions remarks were made by Martin that are cited as sexually harassing. In 1994, Martin asked DeMichele if she “ever cheated on her husband.” At a holiday parly in 1996 or 1997, Martin made a comment about DeMichele’s breasts. Then on October 10, 2000, Martin, during a business meeting in Boston and before a group of company division presidents— mostly men — made the following three remarks to and about DeMichele:
The last time I saw you was in Greece and you had a lot less clothes on. I can fix it so that you have no clothes on now.
He made a comment that he could show me what the meeting was about, after hours under the covers.
What [DeMichele] said [when making her president’s report to Martin and the group] was— "Although traditional staffing is not as sexy a business line as other niches, it is just as successful." And, then, Martin said that [DeMichele] was the sexy one that he could be successful with.
DeMichele testified to being humiliated, embarrassed and deeply offended by Martin’s remarks, particularly because they were made in front of her peers and in the presence of Lento and Strong, who were her superiors.
In addition to the specific comments by Martin, DeMichele testified to generalized accusations that the men who were her peers as division presidents were treated more favorably by Lento than she.
Shortly after the October 10, 2000 meeting, DeMichele complained to Lento about Martin’s comments at the meeting. So far as she knows, Lento took no action in response to her complaint.

The Special Questions for the Jury

The case was given to the jury on a request for a special verdict on written questions. Mass.R.Civ.P. Rule 49(a).
Exercising its discretion, 42 questions were prepared by the Court, most of which were similar, and in some instances identical, with a 40-question form submitted by the plaintiffs.
The very first question posed to the jury asked whether DeMichele resigned from her position as President of New Boston. The jury answered “no” and was then directed to proceed to Question 8. By so doing, the juiy did not answer Questions 2 through 7, which covered the plaintiffs’ claims for breach of fiduciary duly and negligent misrepresentation.
Next, the jury answered “no” to Question 8, which asked whether DeMichele proved that she was treated differently from her male peers because of her gender with regard to the terms, conditions and privileges of her employment; and to Question 10, that inquired whether gender was the motivating factor for her termination or other employment actions by New Boston. Those two answers resulted in the juiy being directed to skip to Questions 15 through 18.
Questions 15 through 17 inquired as to: (1) whether Martin, when acting for New Boston, subjected DeM *476 ichele to sexual advances, requests for sexual favors, or verbal or physical conduct of a sexual nature; (2) whether Martin’s conduct was unwelcome from the perspective of a reasonable woman in DeMichele’s position; and (3) whether Martin’s conduct was objectionable to DeMichele personally. The jury answered “yes” to each of those questions.
Next, however, the jury answered “no” to Question 18, which asked whether Martin’s conduct was sufficiently severe and pervasive, as opposed to isolated and sporadic, to cause DeMichele’s work environment to become hostile, intimidating or humiliating to an objectively reasonable person in her position. This answer caused the jury to be directed to Question 22.
Questions 22, 23 and 24 were all answered “yes.”
Question 22 asked whether DeMichele proved “that she reasonably and in good faith believed that Martin sexually harassed her, or that New Boston discriminated against her on the basis of gender.” During their deliberations, the jury sent a question to the Court, asking it to split Question 22 into two separate questions. After conferring with counsel, the Court advised the jury that it would not change the question, but that they should answer it “yes” if they found that either of the two circumstances were proven.
Question 23 asked whether DeMichele communicated a complaint of sexual harassment or gender discrimination to New Boston.
Question 24, which is objected to by the plaintiffs, reads in its entirety as follows: “Did Ms. DeMichele prove that New Boston retaliated against her: for lodging a complaint of sexual harassment or discrimination against her on the basis of gender; or with respect to the November 13-15 incidents; or because of the January 2, 2001 letter?” After answering this question “yes,” the jury awarded $160,000 for New Boston’s retaliation.
The plaintiffs argue that there was nothing in the evidence of the “November 13-15 incidents” that could be considered a cause for retaliation. Thus, they say, the award of damages for retaliation, both compensatory and punitive, cannot stand.
This Court disagrees. As noted above, the Court must, if it can, harmonize the jury’s answers and also determine whether the verdict rested on the incorrect theory. The harmonizing reveals that the jury proceeded on only one theory — a complaint of sexual harassment — which was not an incorrect theory. This conclusion comes from: the jury’s rejection of gender discrimination by its negative answers to Questions 8 and 10; followed by its positive answers to Questions 15, 16 and 17 regarding verbal conduct of a sexual nature by Martin, which was unwelcome to a reasonable woman and objectionable to DeMichele; then leading to Question 22, which, after the Court’s response to the jury’s question to answer “yes” if DeMichele proved either that she reasonably and in good faith believed that Martin sexually harassed her or that New Boston discriminated against her on the basis of gender, can only be read in a harmonizing fashion to be directed to Martin’s sexually harassing conduct, given that earlier in Questions 8 and 10 the jury rejected gender discrimination as a factor in this case. Then, with this background, and turning to Question 24, it can be seen that what the jury was speaking to was the lodging of a complaint of sexual harassment, which complaint was lodged — the jury could find from the evidence — on two occasions: shortly after the October 10, meeting with Martin; and in the January 2, 2001, letter. The November 13-15 incidents were not complaints of sexual harassment.
This Court, therefore, declines to enter a judgment n.o.v. or to order a new trial because of the jury’s answer to Question 24, as harmonized.
In answering Questions 32 and 33 “yes,” the jury concluded that New Boston breached a material term of DeMichele’s employment contract and acted in bad faith with regard to her rights thereunder. These conclusions could well have been grounded in the jury’s finding that DeMichele did not resign but, rather, was terminated in a manner inconsistent with the provisions of Section 7 of her employment contract. She was entitled to “one year’s prior notice” for any termination not based on her death, a disability, for cause or for poor performance; and there was no evidence upon which the jury could have found any of the foregoing four exclusions.
The jury then awarded DeMichele $506,000 in compensation for the breach of her employment contract and the acts of bad faith in connection therewith. Given that her base salary at the time of her termination was $255,688, that she had an opportunity to earn a bonus of at least $150,000, and that she was prevented by a non-competition covenant from competing with New Boston, the jury’s award does not seem out of line.
Finally, in response to Question 40, the jury awarded DeMichele $1,500,000 in punitive damages against New Boston. The Court will consider the punitive damages, and other damage-related issues, below in a separate section of this memorandum.

The Plaintiffs’ Claims

In essence, New Boston claims that DeMichele, while president of one of its divisions, caused corporate officers senior to her to approve the entry into the Southborough lease for new space, and to purchase an expensive new Caldwell-Spartin computer system. There was no evidence that any information regarding the leasehold property itself or about the computer system itself was withheld by DeMichele from those above her who approved the execution of the lease and the purchase of the computer system.
The most that New Boston pointed to was that DeMichele, at the time she urged the entry into the *477 lease and the purchase of the computer system, intended to quit her job, possibly to join a competitor, and would not, therefore, be able to lead the work of her company in a manner that would earn enough money to pay for the lease and the computer system. The plaintiffs’ complaint, in paragraph 29, makes the following allegations, which by G.L.c. 231, Sec. 87, are binding on them:
At no time during her advocacy for the Southborough Space or the Computer System did Ms. DeMichele ever suggest or disclose to Mr. Lento the fact that she was, at the same time, thinking of leaving the Company and going to work for another company. In urging SANA’S Management Board to approve both of Ms. DeMichele’s proposals, Mr. Lento relied on Ms. DeMichele’s continued leadership of Select Staffing to follow through on her initiatives.
DeMichele, while admitting that she suggested in some form of words that she had an offer from another company, testified that she never said that she had accepted a position with a competitor or that she intended to do so, and there was utterly no evidence on which the jury could have found the fact of an offer from a competitor, or accepting it, was true.
There also is no evidence that a new computer system or the consolidation of space was not desirable from a business point of view. These were rational business judgments, agreed to by all.
Further, there is no evidence that DeMichele herself was going to benefit personally from either the lease or the new computer system — particularly if she quit the company.
These projects were approved: by DeMichele’s immediate senior, Lento; by Lento’s senior, Strong; by Strong’s seniors, including the Chairman of the parent company, Martin; .by the Management Board; and were reviewed and approved by counsel. There was corporate review and approval above DeMichele all the way up the chain of authority.
The plaintiffs’ claims of breach of fiduciaiy duty and misrepresentation regarding the lease and the computer system purchase are each grounded, if at all, on the proposition that DeMichele withheld from Lento and Strong the “fact” that she was going to resign from New Boston and accept the offer from a competitor.
First, the law is quite clear that employees, even partners, have no duty to disclose plans of leaving or intending to leave, even if that leaving is to compete with their employer. Meehan v. Shaughnessy, 404 Mass. 419, 435 (1989), and cases cited therein.
Second, in addressing an earlier summary judgment motion, this Court observed that it had found no cases in Massachusetts, or elsewhere, and none had been cited to it by the plaintiffs, that, giving the plaintiffs the full benefit of all facts and inferences therefrom that might be found by the jury[3] — that DeMichele pressed her superiors to approve two fully explained and reasonable business projects, for which she would receive no personal benefit if she left the company, without telling her seniors that she was intending to leave — would support either a misrepresentation claim or a breach of fiduciaiy duty claim. The Court further noted that it would seem a very strange legal proposition for the business world to find employees, including corporate officers, subject to suit for breach of fiduciaiy duty or misrepresentation for every business transaction proffered that, in hindsight, turned out to be imprudent. On a daily basis the business press is replete with stories about these kinds of decisions that have gone wrong.
Third, and most significantly, the jury found that DeMichele did not resign from New Boston, and thus even that tenuous basis for the plaintiffs’ claims disappeared and there was absolutely no legal justification therefor.
Consequently, the plaintiffs’ complaint in its present motion that it was improper for the Court, in the special questions, to instruct the jury to proceed to Question 8 if they answered “No” to Question 1 cannot be seen to warrant a judgment n.o.v. or a new trial.

Issues Relating to Some of the Defendants’ Counterclaims

DeMichele brings claims for disparate treatment because of her gender, sexual harassment and retaliation under both Federal Title VII and G.L.c. 151B. Before assessing the plaintiffs’ and defendants-in-counterclaims’ issues, the Court pauses to note that with G.L.c. 151B, at least, the Legislature has directed that the Massachusetts anti-discrimination statute “shall be construed liberally for the accomplishment of the purposes thereof...” G.L.c. 151B, Sec. 9, para. 1. The Court will have this mandate in mind when considering the issues presented.
What remains to be discussed of the issues raised in the plaintiffs’ motion are the following: (1) alleged failure or insufficient evidence to prove retaliation; (2) punitive damages as being unwarranted and excessive; (3) retaliation damages as being duplicative of contract damages; (4) emotional distress damages as being excessive; and (5) improper juiy instructions regarding (i) missing witnesses, (ii) retaliation post-resignation, including this suit, and (iii) an absence of instruction on the duty to mitigate damages. The Court will address these points in the same order.
(1) Failure of Proof of Retaliation
The plaintiffs argue that the jury’s finding of retaliation is grounded on an incorrect standard and on inadmissible evidence. They agree that DeMichele needed to show that: (1) she engaged in protected conduct under Title VII or G.L.c. 151B; (2) she suffered an adverse employment action; and (3) the adverse act was causally connected to the protected act.
The evidence presented to the jury readily permitted its determination that DeMichele engaged in protected conduct. She complained of sexual harassment by *478 Martin to her boss, Lento, shortly after the October 10, 2000, meeting, and her lawyer complained in legal detail in the January 2, 2001, letter.
There was evidence from which the jury — which found that she did not resign — could conclude that her employment was terminated by Lento on November 15, 2000, in a manner that constituted a breach of her employment contract and was retaliatory because it was based on the fallacious suggestion that she had resigned. Lento’s position at trial was that he greatly valued DeMichele and, therefore, struggled in vain to convince her not to quit. Implicit in the jury’s finding that DeMichele did not resign is an outright rejection of Lento’s position and a determination that the explanation for his actions were merely a pretext for discrimination.
Circumstantial evidence of causation can be based upon a number of factors, such as the timing of the adverse actions, the lack of credibility of the witnesses for New Boston, or whether New Boston’s non-retaliatory reasons for the adverse actions are implausible. See, e.g., Lipchitz v. Raytheon Co., 434 Mass. 493, 498-99 (2001).
Similarly, there was evidence that in January of 2001, within days of receipt of DeMichele’s lawyer’s letter, the following occurred: her compensation was cut off without notice, and her health benefits were shifted into a COBRA mode; the company’s insurance business was transferred from her husband’s brokerage office; she was sued for claims predicated on an event that the jury found did not occur — her resignation; and she was not paid any of what all indications portended to be a very substantial bonus.
The plaintiffs cite to MacCormack v. Boston Edison Company, 423 Mass. 652 (1996), as support for their argument that there was not sufficient evidence presented to prove unlawful retaliation. In MacCormack, the trial judge instructed the jury that they must find the plaintiff to have suffered “a change in working conditions that materially disadvantaged him and went on to explain that there must also be a causal relationship to that ‘but for the filing and pursuing of his original discrimination claim the adverse reaction would not have been taken by the defendant.’ ” Id. at 662.
This Court observes that in MacCormack the SJC went on, almost immediately, to say: “MacCormack simply offered no substantial evidence to show that he had suffered any real harm, as opposed to his own subjective feelings of disappointment and disillusionment.” Id. at 664. DeMichele, on the contrary, did. She was fired; she had her compensation and benefits cut off; she was sued; and she did not receive her bonus.
It hardly would be a liberal construction of G.L.c. 15 IB, Sec. 9, para. 1, for the accomplishment of the purposes thereof, for this Court to rule that there was insufficient evidence for the jury to find retaliation on the facts presented, and the inferences reasonably to be drawn therefrom, in this case.
(2) Punitive Damages as Being Unwarranted and Excessive
The plaintiffs argue that the issue of punitive damages should not have reached the jury. In making this argument, the plaintiffs proffer that: “At best, the jury found that New Boston’s actions in firing Ms. DeMichele, terminating her pay following her rejection of a severance proposal and filing of a lawsuit constituted retaliation." See Plaintiffs’ memorandum in support of their motion, at p. 14.
The plaintiffs go on to say, among other things, that the “jury did not find that Ms. DeMichele was sexually harassed . . . while she was at New Boston.” Id. This latter statement seems somewhat of a legally semantic exercise. After all, the jury answered each of special Questions 15, 16 and 17 “yes.” Those question asked whether Martin, when acting for New Boston, subjected DeMichele to sexual advances, requests for sexual favors, or verbal or physical conduct of a sexual nature, by conduct unwelcome from the perspective of a reasonable woman in DeMichele’s position and in a manner that was objectionable to DeMichele personally. What the jury declined to accept — by their answer to Question 18 — was that Martin’s conduct was sufficiently severe and pervasive, as opposed to isolated and sporadic, to cause DeMichele’s work environment to become hostile, intimidating or humiliating to an objectively reasonable person in DeMichele’s position. Thus, while this may not be “sexual harassment,” it certainly was sufficient to warrant DeMichele making a complaint about sexual harassment for which she should not have been retaliated against. See, e.g., MacCormack, supra, 423 Mass. at 655 and 663.
This Court believes that the jury’s determination that punitive damages should be awarded was supported by the evidence presented. On this subject, the jury was instructed as the plaintiffs proposed in their Requested Jury Instruction No. 48. The Court read that instruction in its entirety, as follows:
If you find that a defendant-in-counterclaim has intentionally discriminated or retaliated against DeMichele, you may consider in your discretion whether punitive damages are warranted against any such defendant-in-counterclaim. Punitive damages are different from compensatory damages. Unlike compensatory damages, which compensate for the harm suffered, the purpose of punitive damages is to punish a violating defendant-in-counterclaim and to deter future acts of illegal discrimination or retaliation.
In determining the amount of a punitive damages award, if any, you should consider:
1. The character and nature of the defendant-in-counterclaim’s conduct;
2. The defendant-in-counterclaim’s wealth, in order to determine what amount of money is needed to punish its conduct and to deter any future acts of discrimination or retaliation;
*479 3. The actual harm suffered by Ms. DeMichele; and
4. The magnitude of any potential harm to other victims if similar behavior is not deterred.
If you do award punitive damages, you should fix the amount by using calm discretion and sound reason.
The Court accepts the plaintiffs’ requested instruction as a correct statement of the law regarding punitive damages in a case like this. Thus, the only issues remaining regarding punitive damages is whether they were warranted and the amount thereof.
“(P)unitive damages are appropriate ‘where a defendant’s conduct warrants condemnation and deterrence.’ ” Dartt v. Browning-Ferris Industries, Inc. (Mass.), 427 Mass. 1, 17 (1998). Here, the jury was permitted by the evidence to believe that: DeMichele was fired from a long-term, highly compensated position, in a manner contrary to the terms of her employment agreement; was deprived of a substantial bonus; and was sued on groundless claims of breach of fiduciary duty and misrepresentation; all in retaliation for complaining about what she believed was sexual harassment by the very highest and most senior executive of an international conglomerate of companies. To this Court, that warrants condemnation and deterrence.
As to the amount of the punitive damages, again, to this Court, they were not out of line. There was, for example, evidence before the jury from which they could conclude that the amount of the punitive damages was less than one week’s profit for New Boston at rates[4] that it was earning in the year 2000. And this was only the earnings of the American subsidiary of a global enterprise. This is not an excessive amount to address the issues of condemnation and deterrence. See, e.g., Bain v. Springfield, 424 Mass. 758, 767 (1997).
(3) Retaliation Damages as Being Duplicative of Contract Damages; and (4) Emotional Distress Damages as Being Excessive.
The plaintiffs argue that the jury’s award of damages for retaliation is duplicative of the damages awarded for breach of contract and, to the extent based upon emotional distress, excessive. The jury awarded $160,000 in compensatory damages for retaliation. The plaintiffs point out that this could include back pay, front pay, emotional distress and attorneys fees. The plaintiffs then note that no attorneys fees claims or front pay damages were presented to the jury. Therefore, they argue, the only components of the jury’s award had to be back pay and emotional distress damages.. In this connection, the plaintiffs posit a failure to mitigate from that point forward after DeMichele formed her own company, Savvy Staffing Solutions, in July of 2001.
The plaintiffs seem to have overlooked the fact that DeMichele’s employment contract with New Boston contained a non-compete covenant which New Boston threatened to enforce. This, of course, could clearly be a reason why the jury determined that she did all she could to mitigate but was essentially barred by the non-compete covenant. Further, DeMichele testified that her new company, even as of the time of trial in September of 2002, was not yet making a profit.
This Court does not agree with the plaintiffs’ calculation of an appropriate back pay amount to be $40,940.44, or that whatever that amount properly could be, when added to emotional distress damages, could not reach $160,000.
(5) Improper Juiy Instructions Regarding (i) Missing Witnesses, (ii) Retaliation Post-resignation, Including This Suit, and (iii) an Absence of Instruction on the Duty to Mitigate Damages
(i) The plaintiffs complain that the Court improperly gave a missing witness instruction.
The plaintiffs then suggest that the instruction given is what they have attached to their memorandum as Exhibit J. Exhibit J, however, is not the entire instruction given. What the Court instructed was an amalgam of DeMichele’s request No. ID and the plaintiffs’ request No. 7. It therefore reads as follows:
When a party has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case, then that party would normally be expected to offer that person as a witness. If that party does not call the witness to testify, an inference can be drawn that the witness would have provided testimony unfavorable to that party.
In this case, Ms. DeMichele claims that she was sexually harassed and discriminated against because of her gender when Mr. Martin made offensive comments to her. Mr. Martin is a missing witness. If you find that:
1. The missing witness would have been favorably disposed to testify on behalf of the party against whom the inference would be drawn due to his or her relationship to the parties;
2. The missing witness is peculiarly available only to the party against whom the inference would be drawn and there has been no explanation for the witness’s absence;
3. The missing witness is within the exclusive control of the party against whom the inference would be drawn; and
4. The missing witness’s testimony would be relevant and rion-cumulative; then you may infer that had Mr. Martin been called, he would have admitted to saying the comments as alleged by Ms. DeMichele.
Martin fits the criteria for a missing witness. He certainly would have been favorably disposed to testify on behalf of the company of which he is chairman on issues about which he personally was accused of sexual harassment. Martin, a resident of England, is *480 peculiarly available to New Boston. His testimony certainly would have been relevant and non-cumulative, particularly since his employees who did testify were notably weak in the collective memories about what, if anything, he said.
All that was left for the jury to decide was whether there was a believable excuse presented explaining his absence. The Court’s memory is that the excuse was that Martin was conducting a company business meeting on a cruise boat sailing around in the Mediterranean Sea. There was testimony from a New Boston executive that the cruise began on September 21, 2002, after the trial which began on September 18, 2002,[5] and that the cruise ended on September 28, 2002, before the trial ended on October 1, 2002. Nor was there any explanation as to why Martin did not make himself available for his deposition at the request of his own counsel.[6]
This Court perceives no error with regard to missing witness issues.
(ii) Among the other things that the plaintiffs complain about is this Court’s permitting the jury to consider one of the possible elements of retaliation as being the bringing of this suit. They cite to the very recent case of Sahili v. Bull HN Information Systems, Inc., 437 Mass. 696 (2002).
As noted earlier, this Court is handicapped by not having a transcript of its jury charge. It believes, however, from its notes and a review of the requests for instructions submitted by the parties, that it instructed essentially as follows on the issue of the lawsuit as being a proper subject for retaliation:
New Boston’s right to seek resolution of its claims against DeMichele is protected under the First Amendment to the United States Constitution and Article 11 of the Massachusetts Declaration of Rights. Thus, DeMichele may only prove that New Boston initiated this litigation in retaliation against her for complaining about sexual harassment and discrimination by demonstrating either that New Boston’s claims against her have no legitimate basis in fact or law or that New Boston asserted its claims against her for a purpose other than to vindicate its rights. DeMichele may only prove that New Boston initiated this litigation against her in retaliation for complaining about sexual harassment and discrimination if she demonstrates by a preponderance of the evidence that New Boston’s purpose in bringing the suit was other than to vindicate its rights.
This Court believes its instruction to be a fair reflection of the law set out in Sahili and therefore not a basis for a judgment n.o.v. or a new trial.
(iii) Lastly, the plaintiffs assert that there was an absence of instruction to the jury on the duly to mitigate damages. This is not an accurate statement. The Court’s memory is that it gave instruction No. 51 that was requested by the plaintiffs. What it declined to give was instruction No. 53, also requested by the plaintiffs.
The instruction given reads:
Ms. DeMichele had alegal obligation to mitigate her damages by seeking comparable employment work. The standard by which Ms. DeMichele’s efforts in this regard are to be evaluated is whether she acted as a reasonable person would under the same or similar circumstances. Ways in which Ms. DeMichele could have mitigated her damages are:
1. Accepting comparable employment in a location as convenient as or more convenient than the place of her former employment with New Boston; and
2. Reasonably and in good faith applying for such jobs.
If Ms. DeMichele failed to make reasonable efforts to mitigate her damages, you may reduce her recovery by such amount as a reasonable person in Ms. DeMichele’s position would have or could have earned. In other words, you may deduct amounts that were earned by Ms. DeMichele had she used reasonable diligence in looking for another job. You may also reduce her recovery by any periods in which she was unable to work due to other reasons.
Also, at the plaintiffs’ request after the instructions were finished but before the jury was sent out to deliberate, the Court told the jury that on the issue of mitigation they could consider unemployment payments that DeMichele testified to as a deduction.
What the Court did not do — correctly it believes— was tell the jury that DeMichele stopped mitigating her damages when she abandoned her search for comparable employment and started her own business. The Court declined to tell this to the jury because the evidence went unchallenged that she was unsuccessful in finding comparable work because of the non-competition covenant in her employment agreement with New Boston and that she had not made any money on her new business up until the time of trial.

ORDER

For the foregoing reasons, and those stated in the defendant’s opposition, the motion for judgment notwithstanding the verdict, a new trial or remittitur is DENIED.

Despite this collective appellation, there will be times when individual persons or entities will be discussed and addressed.

As permitted by Mass.R.Civ.P. Rule 13(h), DeMichele added Select Appointments North America, Inc., Nicholas J. Lento and Joseph Strong as additional parties to her counterclaims.

Which of course is not the test, now that the jury has spoken. See McEvoy Travel Bureau, Inc., supra, 408 Mass. at 706 n.

$322,000 per working day.

The plaintiffs had full control of the start of the trial and could have put Martin on as their first witness.

The Court is aware from pre-trial events, although the jury was not, that Martin, when DeMichele attempted to bring him into the case and serve process on him, rigidly insisted— as was his right — on the strictest compliance with the Hague Convention on service of process.